IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CLARENCE T. JACKSON,                    :

       Plaintiff,                     :
                                 Case No. 3:09-cv-245
   vs.                                :
                                 JUDGE WALTER HERBERT RICE
SELECTTECH SERVICES CORP.,              :

       Defendant                      :

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN
PART DEFENDANT SELECTTECH SERVICES CORPORATION'S
MOTION FOR SUMMARY JUDGMENT (DOC. #45); DISMISSING
WITH PREJUDICE COUNTS I, II AND IV OF FIRST AMENDED
COMPLAINT

---

Following his termination, Plaintiff Clarence T. Jackson, an African-American

male, filed suit against his former employer, SelectTech Services Corporation,

alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et*

*seq.*, and intentional infliction of emotional distress.  Jackson alleges that he was

subjected to a hostile work environment based on race and sex, was subjected to

disparate treatment based on race, and was retaliated against after he complained

of the discrimination.

This matter is currently before the Court on Defendant's Motion for

Summary Judgment.  Doc. #45.

## I.    Background and Procedural History[1]

Clarence Jackson worked at Wright-Patterson Air Force Base ("WPAFB") from 2002 until his termination on March 4, 2010. From 2002 to 2004, he was employed as a multi-purpose laborer and electrician by Wyle Laboratories, a defense contractor that provided various on-site services at WPAFB. Jackson Dep. at 11.

In 2004, Defendant SelectTech was awarded defense contracts for two clusters of research buildings at WPAFB, the Human Effectiveness Directorate ("HE") and the Materials Directorate ("RX"). SelectTech provided facility management, engineering, technical and computer support. Finch Dep. at 6-7. Jackson, as an incumbent, was hired by SelectTech to work in the HE buildings as an "Engineering Technician Level V." Jackson Dep. at 33-34. His direct supervisor was Dr. Robert Finch, SelectTech's Chief Executive Officer and Program Manager. Finch Dep. at 93.

Prior to 2006, although never formally evaluated, Jackson was regularly praised for his work by the customers he served. Finch Dep. at 91; Exs. 2-14 to Doc. # 51. In 2005, he was promoted to "Site Lead" and given the title of "Technician VI." Jackson Dep. at 36-37. Dr. Finch, however, allegedly

---

[1] As required on a motion for summary judgment, the Court views the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

undermined Jackson's authority, refusing to support him when subordinate employees failed to follow Jackson's directions.  Jackson Dep. at 114-15.

Glenda Tool, another SelectTech employee hired in 2005, was a real property building maintenance person for the HE buildings.  She created the work orders for Jackson and other SelectTech employees.  Mary McClellan, an Air Force employee, served as the quality assurance personnel or "QAP" on the SelectTech HE contract.  She signed the work orders authorizing work to be done by SelectTech employees, dealt with questions or problems related to the contract, and evaluated the contractor's work.  Jackson Dep. at 34-36.

According to Jackson, in 2005, he frequently ate lunch with McClellan and Tool, both white females.  When McClellan told him about her intimate relations with her husband, he told her that he did not want to hear about it.  These discussions made him uncomfortable so he stopped eating lunch with her.  He maintains that this put a strain on their working relationship.  Jackson Aff. ¶ 5; Ex. 5 to Jackson Dep.  Jackson also alleges that, on two occasions, Tool called him in the middle of the night to discuss personal matters.  Jackson did not welcome this attention.  When he reported the phone calls to Dr. Finch, Finch told him "to just get along."  Jackson received no further calls from Tool.  Jackson Aff. ¶ 4.

Jackson maintains, however, that because he rejected the advances of McClellan and Tool, they conspired against him and began making unfounded complaints about his work.  Jackson Aff. ¶¶ 6, 9.  Jackson again complained to

Dr. Finch. When nothing was done to stop the harassment, Jackson hired an attorney who, on September 6, 2006, sent a letter to Dr. Finch on Jackson's behalf. Finch Dep. at 193-94; Ex. 17 to Doc. #51.

According to Jackson, this prompted Finch and McClellan to immediately begin filling his personnel file with unwarranted complaints to support his eventual termination. On September 8, 2006, SelectTech received a "Letter of Concern" from Catherine Doyle, a contracting officer, referring to a "disturbing trend" of customer complaints about Jackson. Ex. A-1 to Finch Decl. Doyle cited three specific incidents. On July 10, 2006, McClellan had complained to Doyle that Jackson was completing work before it was authorized. On July 17, 2006, Dr. Finch received a complaint that electrical wires were left exposed after Jackson was abruptly ordered to stop work on a project. On August 1, 2006, someone complained that Jackson and Tool were involved in wrongfully expediting a branch representative's request for carpeting. Doyle also referred to a situation in which Jackson had refused to move certain phone jacks on September 7, 2006.

In a second "Letter of Concern," dated October 4, 2006, Doyle expressed "growing concerns" about Jackson's "disruptive behavior." Ex. A-2 to Finch Decl. This letter referred to a September 15, 2006, incident in which Jackson was attempting to tape record conversations and meetings. Doyle also complained that Jackson had used a camera to record the condition of a job site prior to its completion. In addition, Doyle alleged that, on September 15, 2006, Jackson had

4

inappropriately contacted a senior government official and other Government employees to discuss certain work-related issues that should have been discussed with Dr. Finch instead.

On October 4, 2006, because of continuing problems with McClellan and Tool, Jackson asked to be moved to a different work location. He also told Finch that he wanted to return to just doing work orders instead of being a site lead. Finch Dep. at 203. Accordingly, on October 10, 2006, Jackson was transferred to the RX cluster of buildings, and voluntarily accepted a demotion to a Tech V position. Jackson Dep. at 39.

Unfortunately, according to Jackson, this did not solve all of his problems. He maintains that he was still subjected to disparate treatment and harassment. Jackson alleges that although Dr. Finch promised him that he would be promoted as soon as another Tech VI position opened up in the RX cluster, Dr. Finch failed to keep this promise, giving the first open position to Rodney Flowers, a white employee. *Id.* at 91.

On December 13, 2006, McClellan complained that Jackson was present in one the HE buildings without authorization. SelectTech agreed that, in the future, Jackson would obtain permission from his supervisor or Dr. Finch prior to entering an NE building, and that McClellan would be notified of the purpose for Jackson's visit. Ex. 34-1 to Doc. #51. Jackson maintains that no similarly-situated employee was subjected to this requirement and that it unreasonably restricted him

5

in the performance of his duties.

In December of 2007, Jackson requested and received permission from Rodney Flowers, his supervisor, to enter Building 248, one of the HE buildings, to deliver a chair. When he was later discovered in Building 441, another HE building, his presence in that building was challenged by a Government employee. As a result, Dr. Finch issued a disciplinary warning. Ex. 4 to Jackson Dep.

On May 17, 2008, Jackson filed a Charge of Discrimination with the Ohio Civil Rights Commission. Ex. 5 to Jackson Dep. In November of 2008, that charge was amended to include allegations that Jason Ritchie, a white co-worker, repeatedly called Jackson "boy," that Ritchie and/or Flowers put laxatives in Jackson's milkshake, and that Dr. Finch rebuffed Jackson when Jackson complained about the quality of prep work done by Glen Cox and Mark Smith. Jackson also alleged that someone defaced a newspaper photograph of President Barack Obama and left in on a table at the RX worksite. Ex. 40 to Doc. #51.

Jackson filed suit against SelectTech on June 26, 2009. On July 7, 2009, Dr. Finch issued a disciplinary notice for insubordination, citing Jackson's alleged failure to complete a report about a lost tool. Ex. 11 to Jackson Dep. Finch issued another disciplinary notice on November 9, 2009, citing Jackson's confrontational behavior with two coworkers. Ex. 20 to Jackson Dep.

On November 12, 2009, Dr. Finch received notice that the Government Security Officer was recommending that Jackson be transferred to another facility

6

because of concerns that Jackson was often at WPAFB at odd hours without authorization, and had confronted government personnel, expressing his disagreement with certain SelectTech directives. Ex. A-3 to Finch Decl. SelectTech maintains that Jackson also began ignoring rules that required preauthorization for overtime. On March 1, 2010, Jackson allegedly defied a directive by making computer entries to the work order system. Finch Decl. ¶¶ 7-11.

On March 4, 2010, Stuart Shuler, another contracting officer, sent SelectTech a third "Letter of Concern," citing Jackson's continued presence at WPAFB at odd hours, inappropriate and confrontational conduct against fellow workers, and his lack of professionalism. Ex. A-6 to Finch Decl. Shuler requested SelectTech to provide a Correction Action Plan by the next day.

Dr. Finch decided to terminate Jackson's employment, effective March 4, 2010, citing continued acts of insubordination, confrontations with coworkers, and the Letters of Concern that were jeopardizing SelectTech's relationship with the Government. Ex. A-7 to Finch Decl.

Jackson's First Amended Complaint, filed on June 23, 2010, includes claims of: (1) hostile work environment based on sex and race; (2) disparate treatment based on race; (3) retaliation; and (4) intentional infliction of emotional distress. Doc. #12. Defendant has moved for summary judgment on all claims. Doc. #45.

7

## II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a

jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990); *see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561

(7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992), *cert. denied*, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.   Analysis

### A.   Title VII Claims: Burden-Shifting Framework

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In addition to protecting against discrete acts of discrimination, this subsection of the statute also protects against discriminatory conduct that creates an intimidating, offensive or hostile working environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-66 (1986). Another subsection of Title VII prohibits an employer from retaliating against an employee because that person has opposed discriminatory employment practices. *See* 42 U.S.C. § 2000e-3(a).

In this case, Jackson has alleged that SelectTech violated Title VII by subjecting him to a hostile work environment based on his race and his sex, by treating him less favorably than similarly-situated white employees, and by terminating him because he complained of the discrimination.

10

A plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or by presenting sufficient circumstantial evidence from which a jury may infer a discriminatory motive underlying an adverse employment action.[2] *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).

Where, as in this case, the plaintiff has only circumstantial evidence of a discriminatory motive, claims are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of discrimination or retaliation. The elements of a prima facie case vary slightly depending on the nature of each claim. Nevertheless, the relevant question is always whether the plaintiff has presented sufficient evidence that he suffered an adverse employment action under circumstances that give rise to an inference of discrimination. *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007).

If the plaintiff is successful in establishing a prima facie case, an inference of discrimination arises and the burden of production shifts to the employer to

---

[2] Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). A facially discriminatory employment policy or an express statement by a decision-maker of a desire to terminate employees because they belong to a protected class would constitute direct evidence of discrimination. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802–03. If the employer satisfies this burden, the presumption of discrimination drops away, leaving only the issue of "discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000).

The plaintiff must then prove, by a preponderance of the evidence, that the reason offered by the employer was pretextual. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the adverse employment action; or (3) the proffered reason was insufficient to motivate the adverse employment action. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471-72 (6th Cir. 2002).

The question is whether the reasons given for the termination were "fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). As the Sixth Circuit explained in *Chen*, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." If, based on the evidence presented, a jury could reasonably doubt the employer's explanation, then summary judgment is not proper. *Id.* at 400 n.4.

With this analytical framework in mind, the Court turns first to Jackson's hostile work environment claim.

### 1.    Hostile Work Environment

In Count I of the First Amended Complaint, Jackson alleges that SelectTech subjected him to a hostile work environment based on race and sex. He maintains that Tool and McClellan subjected him to continuous harassment. He also maintains that he was subjected to threatening confrontations by Dr. Finch and Glen Cox. According to Jackson, although he complained to Dr. Finch about the harassment, SelectTech failed to take corrective action. Am. Compl. ¶¶ 48-55.

SelectTech argues that summary judgment is appropriate because Jackson's claim of a hostile work environment based on sex is time-barred and has been abandoned, and because Jackson cannot establish a prima facie case of hostile work environment.

### a.    Statute of Limitations

SelectTech maintains that Jackson's claim of a hostile work environment based on sex is time-barred. Claims arising more than 300 days before the filing of a charge of discrimination with the Equal Employment Opportunity Commission are time-barred under Title VII. *See* 42 U.S.C. § 2000e-5(e)(1).

Jackson filed his charge of discrimination on May 17, 2008. His sex-based claims stem from his interactions with McClellan and Tool. He admitted, however, that he had little or no contact with McClellan or Tool after October of 2006 when

13

he transferred to the RX buildings.  Jackson Dep. at 62-63.  SelectTech therefore argues that because the sex-based claim arose more than 300 days before Jackson filed his charge of discrimination, this portion of the claim is time-barred.

In response, Jackson argues that McClellan continued to cause problems for him even after his transfer.  On December 13, 2006, she reported his unauthorized presence in one of the HE buildings, and subsequently told SelectTech, "[i]f there is any reason that he needs to be in our buildings, I want to be notified prior to him coming."  Ex. 34-4 to Doc. #51.  Dr. Finch reprimanded Jackson on December 14, 2007, for violating McClellan's directive.  Ex. 4 to Jackson Dep.  Jackson maintains that because he was reprimanded for this violation less than 300 days before he filed his charge of discrimination, the claim is timely.

SelectTech offers no authority for segmenting Jackson's hostile work environment claim into two parts, one based on sex and one based on race, or for dismissing only the sex-based portion of the claim on statute of limitations grounds.  Nor does SelectTech offer any authority to support its argument that only those acts that occur within 300 days of the date the charge is filed may be considered as part of the hostile work environment claim.

In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that when a plaintiff alleges a hostile work environment, it does not matter that some of the acts contributing to the claim occurred more than 300 days before a charge is filed.  "Provided that an act contributing to the claim

14

occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

Jackson has alleged numerous acts contributing to the hostile work environment occurring within 300 days of the date he filed his charge of discrimination. The Court therefore finds that the entire hostile work environment claim is timely filed.

### b.    Partial Abandonment

SelectTech also argues that Jackson has abandoned the sex-based portion of the hostile work environment claim. During Jackson's deposition, his attorney stated that "based on the facts as I know them, I don't believe that is now a viable claim for gender discrimination with respect to Glenda Tool." Jackson Dep. at 64.

Jackson denies that he abandoned this portion of the claim, and argues that his attorney made this statement before learning that McClellan continued to harass Jackson even after he transferred to the RX buildings. In any event, the statement made at the deposition refers only to claims against Tool; it does not mention claims against McClellan. The Court, therefore, rejects SelectTech's abandonment argument.

### c.    Merits of Claim

A hostile work environment exists when "the workplace is permeated with 'discriminatory intimidation, ridicule and insult. . .'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank*, 477 U.S. at 65). In order

15

to establish a prima facie case of a hostile work environment based on coworker harassment, Jackson must demonstrate that: (1) he was subjected to unwelcome harassment; (2) the harassment was based on his status as a member of a protected class; (3) the harassment was "sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment"; and (4) the employer knew or should have known of the alleged harassment and failed to take prompt remedial action. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).[3]

In determining whether the harassment is sufficiently severe or pervasive to be actionable under Title VII, courts must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 F.3d at 23.

The conduct at issue must be evaluated from an objective and subjective point of view. The harassment must be severe or pervasive enough to create an environment that a reasonable person would find "objectively hostile or abusive," and the plaintiff must have subjectively perceived the environment to be so. *Id.* at

---

[3] If the harassment is perpetrated by the employee's *supervisor*, the employer is strictly liable absent a showing that: (1) the employer exercised reasonable care to prevent and promptly correct any harassing behavior; and (2) the employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 348 (6th Cir. 2005) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998)).

21-22. Standards for judging hostility are quite demanding and are aimed at filtering out "complaints attacking the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation and citation omitted).

In determining whether the alleged harassment is sufficiently severe or pervasive, the scope of the analysis is further limited by the requirement, as set forth in the second element of the prima facie case, that the harassment be based on the plaintiff's status as a member of a protected class. Only harassment based on such a status may be considered in determining whether the totality of the harassment is sufficiently severe or pervasive. *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). The Court turns first to that issue.

### i)    Based on Sex or Race?

In order to establish a prima facie case of a hostile work environment, Jackson must prove that the alleged harassment would not have occurred but for his status as a member of a protected class, *i.e.*, male or African-American. He may do so either by presenting direct evidence of the use of race-specific or sex-specific language or derogatory terms, or by presenting evidence comparing how the alleged harasser treated him compared to members outside the protected class. *Id.*

Jackson has presented no evidence that any of the alleged harassment was motivated by a sexual animus. He does not allege that anyone used sexually-

17

explicit language, made any sexually-suggestive remarks to him, or otherwise referred to him in a derogatory manner because he is male.  He does not allege that anyone made unwanted physical contact with him of a sexual nature.  Nor does he allege that men who worked at SelectTech were treated less favorably than women.  In each of these respects, this is a far cry from the typical claim of a hostile work environment based on sex.

Instead, Jackson essentially argues that Tool and McClellan retaliated against him because he rebuffed Tool's alleged "advances," and later complained about their conduct to Dr. Finch and to the Equal Employment Opportunity Commission.  He further alleges that Dr. Finch conspired with Tool and McClellan to fill his personnel file with unwarranted complaints to support Jackson's eventual termination.

These claims of retaliatory harassment are more appropriately addressed in the context of Jackson's retaliation claim.  *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790-91 (6th Cir. 2000) (holding that retaliatory conduct, that was in no way sexual, was not actionable as sexual harassment under Title VII).  There is simply no evidence to support a finding that Jackson was harassed because is male.

Likewise, there is little or no evidence to support a finding that the alleged retaliatory harassment by Tool, McClellan and Finch was motivated by any racial animus.  Jackson admitted at his deposition that none of the managers, including

18

Dr. Finch, ever did anything to indicate a racial bias, and Jackson observed no other African-American employees discriminated against on the basis of race. Jackson Dep. at 113-14. Although Jackson speculates that Tool and McClellan were racially biased against him, nothing in the record supports his claim. Under these circumstances, his claims of retaliatory harassment are better addressed in the context of his retaliation claim.

Jackson alleges additional instances of workplace harassment by other coworkers, but again, for the vast majority of these incidents, there is little evidence to support a finding that they were motivated by a racial animus. As to Jackson's confrontations with Cox and other employees, Linda Vikmanis, SelectTech's Director of Human Resources, found that these were not race-based, but were "strictly coworker disagreements." Vikmanis Dep. at 85-86.

Jackson does, however, present direct evidence of three instances of racial harassment. One of his white coworkers, Jason Ritchie, repeatedly called him "boy," a racially derogatory term. Jackson Dep. at 66. Jackson also alleges that Ritchie, and perhaps Rodney Flowers, put a laxative in Jackson's milkshake one day. *Id*. at 75-76. Because Ritchie was involved, it could be inferred that this incident was also racially motivated. In addition, Jackson alleges that someone defaced a newspaper photograph of Barack Obama by drawing a bone through his nose. The defaced photograph was left on a table in a common area of one of the RX buildings where Jackson worked. Jackson believed that this act was directed

19

against African-Americans. *Id.* at 105-07. SelectTech impliedly concedes that these three acts of harassment were racially motivated. The next question is whether, looking at the totality of the circumstances, these instances of racial harassment may be deemed severe or pervasive.

### ii)    Severe or Pervasive?

Based on the evidence presented, no reasonable jury could find that the alleged racial harassment was so severe or pervasive that it affected the terms, conditions or privileges of Jackson's employment. As previously noted, the Court must consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 F.3d at 23.

On one occasion, someone put a laxative in Jackson's milkshake. Although this may have been physically humiliating, Jackson does not allege that he suffered any long-term effects or that it interfered with his work. Likewise, the incident involving the photograph of President Barack Obama was a one-time occurrence. Although the defacing of the photograph was undoubtedly racially offensive, it did not involve any element of a physical threat and cannot be deemed severe.

Jason Ritchie allegedly called Jackson "boy" several times each day. Jackson Dep. at 66. It is not clear how long this behavior continued, but even if it continued for a long period of time, it was not severe, it was not physically

20

threatening or humiliating, and there is no evidence that it interfered with Jackson's work performance.

Although Jackson may have subjectively perceived the workplace environment to be racially hostile or abusive, a reasonable person would not find it to be objectively so.  Under the circumstances presented here, the racial harassment alleged cannot be deemed to be severe or pervasive enough to be actionable under Title VII.

### iii)    Prompt Remedial Action?

Even if the alleged racial harassment was severe or pervasive, Jackson has not presented sufficient evidence from which a reasonable jury could find that SelectTech failed to take prompt remedial action once it became aware of it.

Jackson testified that he complained several times to Rodney Flowers, his Site Lead, about Ritchie's use of the word "boy."  Flowers allegedly talked to Ritchie about it, but Ritchie continued to use that word.  Jackson Dep. at 67-69. Vikmanis has indicated that Jackson should have contacted her or Dr. Finch instead of raising the issue with Flowers.  Ex. to Vikmanis Dep.  Jackson admitted that he did not directly complain to anyone in management.  Jackson Dep. at 71-72.

Vikmanis testified that as soon as she became aware of the situation in October of 2008, through a letter from Jackson's attorney, she launched an investigation.  Ritchie admitted to using that term but said that he meant no

21

offense; he was simply joking around.  Ritchie was suspended for two days and warned that if his behavior continued, he would be terminated.[4]  Vikmanis Dep. at 48-51; Ex. to Vikmanis Dep.  Following the suspension, Ritchie no longer called Jackson "boy."  Jackson Dep. at 72.

When Jackson discovered the defaced photograph of Barack Obama, he complained to management.  Vikmanis and Finch immediately investigated the incident, determined the identity of the individual who defaced the picture, and suspended that person for three days without pay.  Finch Decl. ¶ 12.

It does not appear that SelectTech conducted an investigation or disciplined anyone in connection with the milkshake incident.  Nevertheless, because the Court has found that the alleged racial harassment was not severe or pervasive, SelectTech's failure to take prompt remedial action with respect to this particular complaint is irrelevant to the summary judgment determination.

To summarize, Jackson has presented no evidence from which a reasonable jury could find that the alleged harassment was motivated by a discriminatory animus based on sex.  Rather the alleged harassment appears instead to have been done in retaliation for Jackson's complaints.  Although a few of acts of harassment were based on race, that racial harassment was neither severe nor pervasive enough to be actionable under Title VII.  Moreover, with respect to two of the

_____

[4]  Because of an emergency that arose, Ritchie was called into work during his suspension.  Vikmanis testified, however, that he did lose any overtime pay.  Vikmanis Dep. at 51.

three acts of racial harassment, SelectTech took prompt remedial action once it learned of Jackson's complaints. For these reasons, the Court SUSTAINS SelectTech's motion with respect to Jackson's hostile work environment claim.

### 2.    Disparate Treatment

In Count II of the First Amended Complaint, Jackson alleges that he was treated less favorably than similarly-situated white employees. Am. Compl. ¶¶ 60-61. In order to establish a prima facie case of disparate treatment, Jackson must show that: (1) he is a member of a protected group; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected group, or similarly situated employees outside the protected group were treated more favorably. *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008). As the Sixth Circuit explained in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998), the plaintiff and the employee with whom he seeks to compare himself must be similar in all of the relevant aspects.

SelectTech argues that Jackson cannot establish a prima facie case of disparate treatment based on race because there is no evidence that any similarly-situated employee outside the protected class was treated more favorably than he was. The Court agrees.

In his Memorandum in Opposition to Defendant's Motion for Summary Judgment, Jackson points to three instances in support of his claim of disparate

23

treatment.

First, Jackson maintains that even though Dr. Finch promised him the next available promotion to a Tech VI position following his move to the RX buildings, Dr. Finch instead promoted Rodney Flowers, a white male, in 2008. Jackson Dep. at 91-92. It is not enough to show a broken promise. In order to establish a prima facie case of race discrimination based on a "failure to promote" theory, Jackson must prove that the person who was promoted instead had similar qualifications for the job. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005) ("in order to satisfy the fourth prong of the *prima facie* burden in a failure to promote case, it is incumbent upon the plaintiff to establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications."). Jackson has presented absolutely no evidence concerning Rodney Flowers' qualifications. Absent such evidence, Jackson cannot establish a prima facie case of race discrimination based on a "failure to promote" theory.[5]

Second, Jackson maintains that he was paid less than similarly-situated white employees. He testified that heard Glen Cox and Mark Smith, two white coworkers, bragging about pay increases. Jackson Dep. at 91. However, he has

---

[5] Jackson cites to Flowers' deposition with respect to the circumstances surrounding this promotion. In support of his argument that not all promotions had to be initiated by the Government, Jackson cites to Chris Brickman's deposition. However, neither deposition has been filed with the Court. Because these depositions are not part of the record, Jackson's assertions are not properly supported and cannot be considered. *See* Fed. R. Civ. P. 56(c)(1)(A).

presented no evidence that they were actually given pay increases, and no
evidence to support a finding that they were similarly situated to him in all relevant
respects.[6]  In short, Jackson has failed to present any evidence from which a
reasonable jury could find that he was treated less favorably than a similarly-
situated white employee with respect to the terms or conditions of his
employment.

Finally, Jackson maintains that he was the only SelectTech employee who
was required to obtain prior authorization to enter the HE buildings.  He testified
that Dave Padella, Jim Lowery, Rodney Flowers, Chris Brickman, and Jeff Kern,
white employees with lesser security clearances, were not subject to the same
restriction.  Jackson maintains that because he had a secret security clearance, he
was authorized to enter any of the buildings on the base.  *Id.* at 96-98.  Jackson
conceded, however, that the Government was entitled to challenge his presence in
a building, and that he did not know whether the Government had ever raised any
concerns about other SelectTech employees being present in buildings without
authorization.  *Id.* at 97.

Dr. Finch explained to Jackson that employees working under the Facilities
Management contract "are only sponsored to be at their specific organization's

---

[6] At his deposition, Jackson also complained that electricians Chris Brickman
and another man named Chris were being paid at the Tech VI level while he was
still being paid at the Tech V level.  Jackson conceded, however, that he knew of
no white employees within his own job classification who were paid more than he
was.  Jackson Dep. at 85-88, 94.

buildings," and that the requirement that the Government be informed of visits to other buildings was consistent with government security procedures and had to be adhered to by all SelectTech employees. Ex. 4 to Jackson Dep. SelectTech further notes that Chris Brickman, a site lead, testified that he had restricted access to certain buildings and had to be escorted through secured areas. Brickman Dep. at 35.[7]

In the Court's view, even if there is a genuine factual dispute about whether SelectTech treated Jackson less favorably than similarly-situated white employees with respect to requiring prior authorization to enter the HE buildings, Jackson has nevertheless failed to establish a prima facie case of disparate treatment because this particular restriction does not constitute an adverse employment action as that term has been defined by the Sixth Circuit.

An adverse employment action is one that results in a "materially adverse change in the terms or conditions of employment." *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 410 (6th Cir. 1999) (internal citation and quotation omitted). As the Sixth Circuit explained in *Spees v. James Marine, Inc.*, 617 F.3d 380 (6th Cir. 2010), "[a]dverse employment actions are typically marked by a significant change in employment status, including hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

_____

[7] SelectTech attached relevant portions of Brickman's deposition to its reply brief. Ex. A to Doc. #53.

26

significant change in benefits." *Id.* at 391 (internal citations and quotations omitted).  Requiring Jackson to obtain authorization before entering the HE buildings clearly falls outside the scope of this definition; therefore, it is not actionable.

Jackson has failed to establish a prima facie case of disparate treatment based on race.  The Court therefore SUSTAINS Defendant's motion for summary judgment on Count II of the First Amended Complaint.

### 3.  Retaliation

In Count III of the First Amended Complaint, Jackson alleges that SelectTech terminated his employment because he complained to Dr. Finch about the hostile work environment and filed a charge of discrimination with the Equal Employment Opportunity Commission.  Am. Compl. ¶¶ 64-65.  Jackson filed suit on June 26, 2009, and was terminated on March 4, 2010.  *Id.* at ¶ 68.

#### a.  Prima Facie Case

In order to establish a prima facie case of retaliation, Jackson must show that (1) he engaged in Title VII-protected activity; (2) SelectTech knew that he engaged in the protected activity; (3) SelectTech subsequently took an adverse employment action against him; and (4) there was a causal connection between the adverse action and the protected activity.  *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009).  The Sixth Circuit has noted that the burden of establishing a prima facie case of retaliation is "not onerous, but one easily met."

27

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

SelectTech concedes the first three elements, but argues that, based on the evidence presented, no reasonable jury could find the requisite causal connection between the protected activity and Jackson's termination. SelectTech notes that Jackson was not terminated until March of 2010 -- 8 months after filing his lawsuit, 22 months after filing his charge of discrimination, and several years after making the first of his internal complaints. SelectTech maintains that because there is no temporal proximity, Jackson cannot establish a causal connection.[8]

Absent a showing of temporal proximity, the plaintiff must introduce other evidence of retaliatory conduct in order to establish the requisite causal connection. *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir.

---

[8] Neither party discusses the possibility that other disciplinary actions *leading up to* Jackson's termination, including the threats of suspension and termination, may assist in supplying the requisite causal connection. In the context of a retaliation claim, an "adverse employment action" is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). This is more lenient than the standard applied in the context of discrimination claims. *See Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008).

Threats of termination and "last chance" agreements that move an employee decidedly closer to termination could very well dissuade a reasonable employee from making a charge of discrimination. *See Parks v. Geithner*, No. 3:09cv141, 2011 WL 6148701, at *15 (S.D. Ohio Dec. 9, 2011) (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584 (6th Cir. 2007)). *See also Sanford v. Main St. Baptist Church Manor*, 327 F. App'x 587, 599 (6th Cir. 2009) (holding that "write-ups" by supervisor and recommendation that employee be placed on probation were adverse employment actions in context of a retaliation claim).

2008.)  "Beyond temporal proximity, other indicia of retaliatory conduct would include evidence that the plaintiff was treated differently . . . than similarly situated employees who had not exercised Title VII rights . . . or evidence that the plaintiff was subjected to closer disciplinary scrutiny after exercising Title VII rights."  *Evans v. Prospect Airport Servs., Inc.*, 286 F. App'x 889, 895 (6th Cir. 2008) (internal citation omitted).

Jackson has presented no evidence that he was disciplined more harshly than similarly-situated employees who did not engage in protected activity under Title VII.  He has, however, presented quite a bit of evidence that he was subjected to closer disciplinary scrutiny after exercising his rights.

Prior to 2006, Jackson was viewed as a valuable employee.  Dr. Finch testified that SelectTech did not complete any formal performance evaluations of Jackson prior to the termination.  Finch Dep. at 91.  Nevertheless, Jackson's personnel file contained numerous accolades from the customers he served.  Exs. 2-14 to Doc. #51.  Dr. Finch admitted that, prior to the middle of 2006, he had received no complaints about Jackson.  Finch Dep. at 118-19.

In 2006, shortly after Jackson first complained to Finch about the alleged harassment by Tool and McClellan, things abruptly changed.  Jackson's personnel file began to be filled with documentation concerning a wide variety of work-related incidents.  McClellan testified that Jackson had a habit of beginning work on a project before receiving Government approval.  McClellan Dep. at 34-35.

29

Notes to Jackson's personnel file, dated July 18, 2006, and August 1, 2006,

indicate that Finch counseled Jackson for starting work on a job prior to obtaining

the necessary approvals.  Exs. 20, 21 to Doc. #51.  The July 18, 2006, note also

indicates that Jackson did not suitably mark a site as a construction site when he

was ordered to stop working on a project.  Ex. 20 to Doc. #51.

       Dr. Finch received a letter from Jackson's attorney on September 6, 2006,

citing "an ongoing pattern of abusive behavior carried on by Glenda Tool and

reinforced by Mary McClellan," and alleging a hostile work environment based on

race, age or gender.  Ex. 17 to Doc. #51.  The first "Letter of Concern" from

Catherine Doyle, a Government Contracting Officer, arrived on September 8, 2006,

just two days later, citing various complaints made by McClellan.  Ex. 19 to Doc.

#51.  On September 15, 2006, Finch told Jackson to stop using a tape recorder  at

work and to stop using a camera to photograph job sites.  Exs. 23-24 to Doc. #51.

On that same date, Jackson was accused of trying to contact senior officials at

WPAFB to discuss work-related issues.  Exs. 25, 27 to Doc. #51.  The second

"Letter of Concern" arrived on October 4, 2006.  Ex. 29 to Doc. #51.

       In December of 2006, McClellan challenged Jackson's presence in one of

the HE buildings, resulting in a requirement that he obtain prior authorization each

time he visited the HE buildings.  Ex. 34 to Doc. #51.  He was reprimanded for

violating this requirement in December of 2007, and told that future

insubordination would result in suspension or termination.  Ex. 4 to Jackson Dep.

Jackson filed suit on June 26, 2009.  Less than two weeks later, on July 7, 2009, Finch issued a written reprimand to Jackson for failing to submit a Lost Tool Report, threatening suspension or possible termination.  Ex. 11 to Jackson Dep. Four months later, on November 9, 2009, Finch issued another written reprimand to Jackson concerning two confrontations with coworkers.  Again, Jackson was threatened with suspension or possible termination.  Ex. 20 to Jackson Dep.

In January of 2010, Jackson was reprimanded for failing to obtain pre-approval to work overtime.  Ex. 25 to Jackson Dep.  In February of 2010, Jackson was again reprimanded for a confrontation involving coworker Glenn Cox.  Ex. 64-1 to Doc. #51.  In March of 2010, Jackson was reprimanded for violating a rule concerning procedures for making computer entries in the work order system.  Ex. 27 to Jackson Dep.

Viewing this evidence in a light most favorable to Jackson, the Court concludes that a reasonable jury could find that Jackson was subjected to closer scrutiny after exercising his rights under Title VII, giving rise to an inference of retaliation.  The Court finds that Jackson has established a prima facie case of retaliation.

### b.    Legitimate, Non-Retaliatory Reason

The burden therefore shifts to SelectTech to articulate a legitimate, non-retaliatory reason for terminating him.  SelectTech has satisfied its burden.  It maintains that Jackson was terminated because of his pattern of insubordination

31

and his repeated confrontations with coworkers.  In the termination letter, Dr.
Finch noted that Jackson's misconduct was the subject of several Letters of
Concern and was jeopardizing SelectTech's relationship with the Government.  Ex.
27 to Jackson  Dep.

### c.    Pretext

The burden now shifts back to Jackson to prove, by a preponderance of the
evidence that the proffered reason is pretextual.  Viewing the evidence in a light
most favorable to Jackson and drawing all reasonable inferences in his favor, the
Court finds that Jackson has presented sufficient evidence from which a
reasonable jury could find that:  (1) the proffered reasons had no basis in fact; (2)
the proffered reasons did not actually motivate the adverse employment action; or
(3) the proffered reasons were insufficient to motivate the adverse employment
action.  *See Peters*, 285 F.3d at 471-72.

At the very least, it is somewhat suspicious that as soon as Jackson
complained about the harassment by Tool and McClellan, he became the subject of
numerous complaints, leading to a wide variety of written reprimands in his
personnel file.  Whether those complaints were justified or pretextual is a question
of fact to be decided by a jury.

Jackson maintains that many of the allegations of insubordination are
pretextual.  With respect to Jackson's alleged failure to obtain authorization prior
to beginning work on projects, he argues that prior to July 14, 2006, there was no

32

clearly-established process in place, and that he was, therefore, unfairly blamed for failing to comply with procedures prior to that date. *See* Ex. 46 to Doc. #51. He also maintains that there is little evidentiary support for McClellan's allegation that he repeatedly began projects without getting the requisite approval. At her deposition, McClellan could name only one example. McClellan Dep. at 98.

Jackson further argues that he was unfairly reprimanded concerning his alleged failure to submit the Lost Tool Report. He testified that he explained to Dr. Finch that he had, in fact, twice submitted the report to Patrick Meek as requested, but Meek was on vacation. Finch nevertheless reprimanded Jackson for failing to follow directives. Ex. 55 to Doc. #51; Jackson Dep. at 173-74.

Jackson also argues that the reprimands concerning his confrontations with coworkers were not warranted. With respect to the alleged confrontation with Mark Smith, Jackson testified that he was forced to raise his voice because Smith was working up in the ceiling and could not hear him otherwise. Jackson Dep. at 183-84. Jackson further maintains that Dr. Finch exaggerated the seriousness of a February 22, 2010, confrontation with Glenn Cox. Jackson testified that, contrary to what Cox told Finch, Cox instigated that particular confrontation. Jackson Dep. at 214-15.

In the Court's view, Jackson has presented sufficient evidence from which a reasonable jury could find that the reasons given for Jackson's termination were pretextual. The Court therefore OVERRULES SelectTech's motion for summary

judgment on the retaliation claim.

**B.    Intentional Infliction of Emotional Distress**

In Count IV of the First Amended Complaint, Jackson alleges that

SelectTech's conduct constitutes intentional infliction of emotional distress.  To

succeed on a claim of intentional infliction of emotional distress under Ohio law,

Jackson must prove the following elements:

> (1) the defendant intended to cause, or knew or should have known
> that his actions would result in serious emotional distress; (2) the
> defendant's conduct was so extreme and outrageous that it went
> beyond all possible bounds of decency and can be considered
> completely intolerable in a civilized community; (3) the defendant's
> actions proximately caused psychological injury to the plaintiff; and (4)
> the plaintiff suffered serious mental anguish of a nature no reasonable
> person could be expected to endure.

*Shugart v. Ocwen Loan Servicing, LLC*, 747 F. Supp.2d 938, 944-45 (S.D. Ohio

2010) (citing *Morrow v. Reminger & Reminger Co. L.P.A.*, 183 Ohio App.3d 40,

915 N.E.2d 696, 712-13 (Ohio Ct. App. 2009)).

SelectTech argues that Jackson has failed to present sufficient evidence

from which a reasonable jury could find that SelectTech intended to cause

emotional distress, that SelectTech's conduct was extreme and outrageous, or that

Jackson suffered serious mental anguish.  The Court finds that, even accepting all

of Jackson's allegations as true, the conduct alleged does not rise to the level of

"extreme and outrageous."  Therefore, the Court need not address SelectTech's

other arguments.

34

Ohio courts have defined the second element very narrowly, particularly in the case of employment actions. *See Baab v. AMR Servs. Corp.*, 811 F. Supp. 1246, 1269 (N.D. Ohio 1993) ("to say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement."). The Ohio Supreme Court has held that the second element is met only when "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 6 Ohio St.3d 369, 375, 453 N.E.2d 666, 671 (Ohio 1983), *abrogated on other grounds, Welling v. Weinfield*, 113 Ohio St.3d 464, 866 N.E.2d 1051 (Ohio 2007). Termination of employment, even if discriminatory in nature, does not rise to this level without proof of "something more." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999).

As evidence of extreme and outrageous conduct, Jackson points to the fact that one of his coworkers called him "boy" and put laxatives in his milkshake. This argument is not sustainable as a matter of law. In *Yeager*, the Ohio Supreme Court explained,

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

6 Ohio St.3d at 375, 453 N.E.2d at 671 (quoting *Restatement (2d) of Torts*, § 46

35

cmt. d (1965)).[9]

Because Jackson has failed to present sufficient evidence from which a reasonable jury could find in his favor on his claim of intentional infliction of emotional distress, the Court SUSTAINS Defendant's motion for summary judgment on Count IV of the First Amended Complaint.

## IV.    Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment, Doc. #45, is SUSTAINED IN PART and OVERRULED IN PART.  Plaintiff's claims of hostile work environment (Count I), disparate treatment (Count II), and intentional infliction of emotional distress (Count IV) are DISMISSED WITH PREJUDICE. Plaintiff's retaliation claim (Count III) remains pending for trial.


Date:  January 26, 2012

WALTER HERBERT RICE
UNITED STATES DISTRICT JUDGE


Copies to: Counsel of Record

---

[9] Moreover, an employer is not vicariously liable for an employee's intentional tort which in no way promotes the employer's business. *Osborne v. Lyles*, 63 Ohio St.3d 326, 329-30, 587 N.E.2d 825, 828-29 (Ohio 1992). Therefore, even if the coworker's conduct could be deemed "extreme and outrageous," there is no basis for holding SelectTech liable absent evidence that SelectTech expressly authorized the conduct or later ratified it.